UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 22 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MICHAEL P. WARD, Dr., D.O., husband; et al., | No.    22-16473 |
| Plaintiffs-Appellants, | D.C. No. 3:22-cv-08015-DJH District of Arizona, Prescott |
| v. | ORDER |
| BENNIE G. THOMPSON, in his official capacity as Chairman of the House Select Committee to Investigate the January 6th Attack on the United States Capitol; et al., | |
| Defendants-Appellees. | |

Before:  SILVERMAN, IKUTA, and MILLER, Circuit Judges.

Order by Judges SILVERMAN and MILLER, Dissent by Judge IKUTA

Appellants, Dr. Kelli Ward et al., brought this action to quash a subpoena

issued by the House Select Committee to Investigate the January 6th Attack that

directs T-Mobile USA, Inc., to release call records from Ward's phone for the

period of November 1, 2020 through January 31, 2021. The records include

metadata such as the time and duration of incoming and outgoing calls and the

numbers involved; they do not include content or location information. The district

court denied the motion to quash, and Ward now seeks an injunction pending

appeal barring T-Mobile from complying with the subpoena. We deny the

injunction.

In *Winter v. NRDC, Inc.*, the Supreme Court held that a party seeking a preliminary injunction must establish four things: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." 555 U.S. 7, 20 (2008) (emphasis added). Despite the language of *Winter*, we have held that an injunction does not necessarily require that the party seeking it be "likely to succeed on the merits." Rather, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

We assume, without deciding, that the balance of hardships tips sharply in Ward's favor. Under *Alliance for the Wild Rockies*, we therefore ask whether Ward has raised "serious questions going to the merits." 632 F.3d at 1132. Ward's claims rest on the First Amendment and on the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936. The latter claim is insubstantial, so we focus on the First Amendment claim. As to that claim, we conclude that Ward has not raised serious questions on the merits—and, a fortiori, that she is not likely to succeed on the merits.

The First Amendment protects a right to anonymous association. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *cf. McIntyre v. Ohio*

2

*Elections Comm'n*, 514 U.S. 334, 342 (1995) (holding that the First Amendment

protects the freedom to publish anonymously). Thus, "before requiring that

organizations reveal sensitive information about their members and supporters,"

we must ask whether the compelled disclosure satisfies exacting scrutiny.

*Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021). A

compelled disclosure meets the exacting scrutiny standard if (1) there is "a

substantial relation between the disclosure requirement and a sufficiently important

governmental interest," and (2) the requirement is narrowly tailored. *Id.* at 2383

(quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

But the exacting scrutiny test does not apply to *all* compelled disclosures of

information, regardless of the nature of the information sought. Instead, the

Supreme Court has explained that courts should apply the exacting scrutiny test

"before requiring that *organizations* reveal *sensitive information about their*

*members and supporters*." *Americans for Prosperity Found.*, 141 S. Ct. at 2384

(emphasis added). And we have previously held that, for any kind of heightened

scrutiny to apply to a compelled disclosure, the party resisting disclosure must

make a "*prima facie* showing . . . that enforcement . . . will result in (1)

harassment, membership withdrawal, or discouragement of new members, or (2)

other consequences which objectively suggest an impact on, or 'chilling' of, the

members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160

(9th Cir. 2010) (quoting *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860

F.2d 346, 349–50 (9th Cir. 1988)). In short, before subjecting a compelled

disclosure to heightened scrutiny under the First Amendment, we must determine

that "disclosure of the information will have a deterrent effect on the exercise of

protected activities." *Id.* at 1162; *see also Citizens United v. Federal Election

Comm'n*, 558 U.S. 310, 370 (2010) (explaining that an as-applied challenge to a

disclosure requirement can succeed only where there is a "reasonable probability

that the group's members would face threats, harassment, or reprisals if their

names were disclosed").

     Here, there is little to suggest that disclosing Ward's phone records to the

Committee will affect protected associational activity. Unlike the regulation at

issue in *Americans for Prosperity Foundation*, which required organizations to

reveal their major donors, this subpoena does not target any organization or

association. The investigation, after all, is not about Ward's politics; it is about her

involvement in the events leading up to the January 6 attack, and it seeks to

uncover those with whom she communicated in connection with those events. That

some of the people with whom Ward communicated may be members of a political

party does not establish that the subpoena is likely to reveal "sensitive information

about [the party's] members and supporters." *Americans for Prosperity Found.*,

141 S. Ct. at 2384. Grand juries—and, for that matter, civil litigants—routinely

employ subpoenas for phone records, and any such subpoena necessarily reveals something about a person's associations. We do not read *Americans for Prosperity Foundation* as establishing that all of those subpoenas are subject to First Amendment scrutiny.

To prevail, Ward must therefore identify some reason to think that compliance with this subpoena will burden association. The district court found that there is "no evidence to support [the] contention that producing the phone numbers . . . will chill the associational rights of Plaintiffs or the Arizona GOP," and it determined that Ward's arguments to the contrary are "highly speculative." We review that factual finding for clear error. *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 380 & n.11 (9th Cir. 2016).

The district court's finding is amply supported by the record. In their declarations, the Wards say that they use their phones to communicate with patients in their medical practices, to talk to family and friends, and to "make and receive calls of a political nature" and "to and from people in the political world." Those vague statements do not show that disclosing the phone numbers involved would reveal anyone's private organizational membership, much less that the people involved in the calls would be reluctant to associate with any organization or political party if their identities were revealed. If declarations like these were sufficient, it would mean that anyone could raise a First Amendment objection to

any subpoena for records of calls that included discussions of politics—or, presumably, of "social, economic, religious, [or] cultural" matters. *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). (Narcotics traffickers, or anyone else who might face such subpoenas, would be well advised to make at least a few calls to their preferred political party.) But that is not the law. And although the declarations also state that the Wards have received threatening and harassing messages because of their political activities, it does not follow that anyone known to have called them would face similar harassment.

Because there is no indication that the compelled disclosure in this case would deter protected associational activity, the exacting scrutiny standard does not apply. But even if that standard did apply, this subpoena would satisfy it. The subpoena is substantially related to the important government interest in investigating the causes of the January 6 attack and protecting future elections from similar threats. *Cf. Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021) (noting that "the January 6th Committee plainly has a 'valid legislative purpose'" (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031–32 (2020))), *cert. denied*, 142 S. Ct. 1350 (2022). Ward participated in a scheme to send spurious electoral votes to Congress, a scheme that the Committee describes as "a key part" of the "effort to overturn the election" that culminated on January 6. Although Ward asserts that "[c]ongressional investigators already know what [she] did," the

Committee explains that that is untrue: When the Committee sought to question her about those activities, she invoked the Fifth Amendment and refused to answer. In this civil proceeding, it is appropriate to draw adverse inferences from her assertion of the Fifth Amendment privilege—namely, that Ward's conduct during the period in question went beyond simple discussions with her political associates, and that those with whom she communicated might have the information about her activities that she refused to provide. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

Having attempted the less intrusive method of asking Ward directly, the Committee has a strong interest in pursuing its investigation by other means. The subpoena is a narrowly tailored mechanism for doing so because it seeks only Ward's phone records, only from the critical window of November 1, 2020 through January 31, 2021, and only metadata, not content or location information. *Cf.* Stipulation of Voluntary Dismissal at 1, *Eastman v. Thompson*, No. 1:21-cv-03273-CJN (D.D.C. June 28, 2022) (dismissing challenge to similar subpoena after the Committee clarified that it was "not seeking the content of any of Plaintiff's communications").

The temporary injunction entered on October 18, 2022 is lifted. The motion for injunctive relief (Docket Entry No. 5) is **DENIED**.

The existing briefing schedule remains in effect.

*Ward v. Thompson*, No. 22-16473
Ikuta, J., dissenting

"First Amendment freedoms need breathing space to survive." *Americans for Prosperity Found. v. Bonta (APF)*, 141 S. Ct. 2373, 2389 (2021) (citation and quotation marks omitted). Therefore, "[w]hen it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals," but also by the mere "risk of a chilling effect on association." *Id.* Here, a House Select Committee (the Committee) is attempting to obtain the names of the Arizona Republican Party (the Party) members who spoke to Kelli Ward, the Party's chair, during a period of contentious political upheaval. But the Committee has not provided any explanation as to why the phone records are relevant to its investigation. Because such government inquiries "discourage citizens from exercising rights protected by the Constitution," *id.* at 2384 (citation and quotation marks omitted), the Wards' challenge to the Committee's subpoena raises at least "serious questions going to the merits" of their First Amendment claim, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The majority's view to the contrary is in conflict with the Supreme Court's recent landmark ruling, *Americans for Prosperity Foundation*, 141 S. Ct. at 2389. By denying the Wards' motion for an injunction pending appeal, the majority likely prevents the Wards

1

from raising serious questions regarding Kelli Ward's constitutional rights,
because once T-Mobile produces her phone records, the Wards' appeal may be
moot.  Therefore, I dissent.

I

The First Amendment right of expressive association protects individuals'
freedom "to associate with others for the common advancement of political beliefs
and ideas."  *Kusper v. Pontikes*, 414 U.S. 51, 56 (1973).  As *Americans for
Prosperity Foundation* made clear, *whenever* the government compels disclosure
of members' identities, it burdens the First Amendment right of expressive
association.  141 S. Ct. at 2382; *see also id.* at 2395 (Sotomayor, J., dissenting)
(stating that the Court's opinion "presumes . . . that all disclosure requirements
impose associational burdens").  This is because "[w]hen it comes to a person's
beliefs and associations, [b]road and sweeping state inquiries into these protected
areas . . . discourage citizens from exercising rights protected by the Constitution."
*Id.* at 2384 (citation and quotation marks omitted) (alterations in original).  The
particular means employed by the government to compel disclosure of members'
identities does not change the analysis.  A court order or subpoena compelling
disclosure may burden First Amendment rights just as much as legislation.  *See,
e.g.*, *NAACP v. Patterson*, 357 U.S. 449, 453 (1958) (considering Alabama's

2

motion for production of the NAACP's records and papers in litigation); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 542 (1963) (considering an order by a committee of the Florida Legislature to the president of the NAACP's Miami branch to appear before it and bring the branch's membership records).  For example, to the extent a First Amendment right of expressive association protects reporters from a government subpoena, it also protects their phone records held by third party telephone providers.  *New York Times Co. v. Gonzales*, 459 F.3d 160, 168 (2d Cir. 2006).

Under *Americans for Prosperity Foundation*, compelled disclosure requirements of any sort must be reviewed with "exacting scrutiny."[1]  141 S. Ct. at 2383.  In a departure from its past cases, the Court subjected disclosure requirements to exacting scrutiny without first requiring plaintiffs to establish that the disclosure will actually subject them to threats, harassment, or reprisal. Following *Americans for Prosperity Foundation*, courts must presume that a disclosure requirement burdens First Amendment rights without any showing of specific deterrence of individual members.  *Id.* In other words, the inherent

---

[1] A majority of justices in *Americans for Prosperity Foundation* agreed that exacting scrutiny or a more rigorous standard of review is applicable.  *See* 141 S. Ct.  at 2383 (plurality opinion); *id.* at 2390 (Thomas, J., concurring in part and concurring in the judgment); *id.* at 2391 (Alito, J., concurring in part and concurring in the judgment).

"deterrent effect of disclosure" is sufficient to establish a First Amendment burden.
*Id.* at 2382 (citation and quotation marks omitted).  And "[e]xacting scrutiny is
triggered by state action" alone, so long as that action "*may* have the effect of
curtailing the freedom to associate."  *Id.* (citation and quotation marks omitted).[2]
In applying exacting scrutiny to a disclosure requirement, a court must determine
whether the government has shown "a substantial relation between the disclosure
requirement and a sufficiently important governmental interest, and that the
disclosure requirement [is] . . . narrowly tailored to the interest it promotes."  *Id.* at
2385 (cleaned up); *see also id.* at 2390 (Thomas, J. concurring in part and
concurring in the judgment); *id.* at 2391 (Alito, J., concurring in part and
concurring in the judgment); *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).

II

In this case, Kelli Ward, as the chair of the Republican Party of Arizona, is
responsible for contacting and coordinating with members of her Party about
elections.  She plays a heightened role "when there is public controversy

---

[2] Because *Americans for Prosperity Foundation* held that a court must
presume that a disclosure requirement burdens First Amendment rights and start its
analysis by determining whether the disclosure requirement is narrowly tailored, it
supersedes *Perry v. Schwarzenegger*, which held that a plaintiff challenging a
disclosure requirement must first demonstrate that the compelled disclosure will
result in actual harassment or other consequences that will have a chilling effect.
591 F.3d 1147, 1160–61 (9th Cir. 2010).  **Maj. op. at  3–4.**

4

concerning the outcome of an election."  During the period from November 1,

2020 to January 31, 2021 (the period targeted by the Committee's subpoena), the

legitimacy of the 2020 presidential election was in dispute, and Ward used her

phone to communicate with Party members about the election.  Contrary to the

majority's view that "this subpoena does not target any organization or

association," **Maj. op. at 4**, the subpoena on its face compels the disclosure of

identifying information of Party members with whom Ward had contact.

Moreover, because the Committee is "no longer seeking . . . [Ward's] patient

phone numbers," and it is unlikely that the duration of Ward's calls with her

children and parents, would provide the Committee with useful information about

the events surrounding January 6, the only plausible explanation for the

Committee's interest in Ward's phone records is that they reveal information about

other Party members.  **Maj. op. at 5.**  Such identifying information may expose

these members to congressional investigation, perhaps federal criminal

investigation, and related public criticism.

The communications at issue here between members of a political party

about an election implicate a core associational right protected by the First

Amendment.  *See Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("[T]he First . . .

Amendment[] guarantee[s] freedom to associate with others for the common

5

advancement of political beliefs and ideas, a freedom that encompasses the right to associate with the political party of one's choice." (cleaned up)).  Therefore, under *Americans for Prosperity Foundation*, the Committee's subpoena constitutes a disclosure requirement that is presumed to burden Ward's First Amendment right of expressive association.  141 S. Ct. at 2382–84, 2388.  As such, exacting scrutiny applies without any showing of harassment or other consequences to Ward.  **Maj. op. at 4–5**.  Under this standard of review, the burden is on the Committee to establish that there is a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the subpoena is narrowly tailored to that interest.  *See APF*, 141 S. Ct. at 2385.

The Committee has not carried that burden.  Even assuming that the government's interest in investigating the events of January 6, 2021, is sufficiently important, the Committee has not provided any evidence or plausible reason to believe that Ward's contacts (whether political associates, family, or friends) were involved in the events of January 6 or explain why information about her communications has any bearing on the Committee's investigation.  Trying to fill this gap, the majority speculates that Ward's invocation of the Fifth Amendment before the Committee warrants "adverse inferences" that she was engaged in criminal conduct with her political associates and that those associates "might have

6

the information about her activities that she refused to provide."[3] **Maj. op. at 7.**
But the Committee itself did not offer this rationale.[4]  And it is improper for the
majority to hold there is a substantial relationship between the Committee's
subpoena and its investigation of the events of January 6 based solely on its own
speculation.  Because the Committee does not provide any actual explanation for
its inquiry other than its general investigative interests, and therefore has not
shown that there is a substantial relationship between the disclosure requirement
and an important governmental interest, the Wards have shown at least "serious
questions going to the merits" of their First Amendment claim, *All. for the Wild
Rockies*, 632 F.3d at 1135, if not a likelihood of success, *Winter v. Nat. Res. Def.
Council, Inc.*, 555 U.S. 7, 20 (2008).

In holding to the contrary, the majority relies primarily on the policy concern
that applying the exacting scrutiny test required by *Americans for Prosperity
Foundation* would lead to absurd results of allowing persons engaged in narcotic
trafficking "or anyone else" to raise a First Amendment objection to subpoenas of

---

[3] The subpoena issued on January 19, 2022, and Ward did not invoke the
Fifth Amendment until October 4, 2022.  So the "adverse inferences" the majority
draws are post-hoc rationalizations that cannot justify the Committee's issuance of
the subpoena.

[4] Perhaps the Committee would make this argument in response to the
Wards' arguments on appeal.  But because the majority denies the Wards' motion
for injunctive relief pending appeal, we will likely never know.

telephone records.  **Maj. op. at 6.**  This concern is unfounded.

First, it is obvious that not every individual can raise a First Amendment claim to protect compelled disclosure of phone records.  **Maj. op. at 5–6**.  The First Amendment protects only those individuals engaged in expressive association, meaning that they have joined together to collectively express and pursue the "views that brought them together" on "political, social, economic, religious, and cultural" matters.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984).  By contrast, the First Amendment does not protect commercial or social associations because those relationships are not formed to collectively express and pursue shared beliefs.  *See City of Dallas v. Stanglin*, 490 U.S. 19, 24–25 (1989); *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1195 (9th Cir. 1988).  Indeed, this may be why the Wards sensibly did not raise a First Amendment claim with regard to the subpoena's compelled production of phone records concerning Ward's patients, family, and friends.

Moreover, if the requirement that the association be *expressive* does not assuage the majority's fears, the exacting scrutiny standard should.  A properly tailored subpoena, seeking (for example) a narcotics trafficker's phone records with regard to known criminal associates, would not be blocked by exacting scrutiny.  When an investigation is based on probable cause that particular

8

individuals are engaging in criminal activity, the government should have no problem showing a substantial relationship between the disclosure requirement and a sufficiently important governmental interest, or to show narrow tailoring regardless of a "few calls" by those individuals to a political party. **Maj. op. at 6.** But where a subpoena broadly seeks information about political association and the government makes no effort to explain why such information is helpful to its wide-ranging investigation, exacting scrutiny protects core constitutional rights.

Finally, comparing Ward's coordination of her Party's activities during a national election—a core First Amendment activity, *Buckley*, 424 U.S. at 15—to the criminal (and commercial) acts of a narcotics trafficker—decidedly non-expressive activities, *IDK, Inc.*, 836 F.2d at 1195—conflates political dissidence with criminality. **Maj. op. at 6**. It was precisely that unconstitutional conflation that led the Supreme Court to first recognize the right of expressive association. *NAACP*, 357 U.S. at 462; *see also NAACP v. Button*, 371 U.S. 415, 438 (1963) ("[T]he State's attempt to equate the activities of the NAACP and its lawyers with common-law barratry, maintenance and champerty, and to outlaw them accordingly, cannot obscure the serious encroachment worked by [a state anti-solicitation law] upon protected freedoms of expression.").

III

Regardless of Ward's position regarding the 2020 election, her right to engage in discussions with her political associates remains entitled to First Amendment protection against the government's compelled disclosure of her political affiliations.  **Maj. op. at 6–7**.  We must be vigilant to protect First Amendment rights—even when raised by an individual alleged to have engaged in a nefarious "scheme," **Maj. op. at 6**—because "[t]he weakening of constitutional safeguards in order to suppress one obnoxious group is a technique too easily available for the suppression of other obnoxious groups to expect its abandonment when the next generally hated group appears," *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 166 (Black, J., dissenting).  Because the majority has applied an erroneous legal framework, and the Wards' claim that the Committee's subpoena burdens Kelli Ward's First Amendment rights at least raises a serious question on the merits, I dissent.